AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☒ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

07/22/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

July 22, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KC _____ DEPUTY

UNITED STATES OF AMERICA,

v.

TRISTAN JON TAYLOR,
DANIEL COREY ROACH,
DEJON THOMAS NUNLEY, SR.,
LIONEL ROBERTS, and
SHAWN TERRELL LYNDOLPH,

Defendants.

Case No.  5:21-mj-00494

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about the date of February 17, 2021, in the county of San Bernardino in the Central District of California, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm and/or Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/

*Complainant's signature*

ATF Special Agent Paul Kirwan
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  July 22, 2021

*Judge's signature*

City and state:  Riverside, California

Hon. Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: John A. Balla (x6246)

## AFFIDAVIT

I, Paul Kirwan, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrants against (1) Tristan Jon TAYLOR, (2) Daniel Corey ROACH, (3) Dejon Thomas NUNLEY, Sr., (4) Lionel ROBERTS, and (5) Shawn Terrell LYNDOLPH, for violations of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm and/or Ammunition.

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. BACKGROUND OF AFFIANT

3.    I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since May 2017.  I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy.  I am an ATF Interstate Nexus Expert and routinely examine firearms and ammunition to determine their origins and travel in interstate commerce.  During my time as an ATF SA, I have

testified as an expert witness in federal court on the interstate nexus of firearms and ammunition, participated on multiple different task forces, and assisted in multiple narcotics and firearms investigations.

### III. STATEMENT OF PROBABLE CAUSE

4.    Based on my review of law enforcement reports, my review of surveillance video, and my conversations with other law enforcement agents, I believe the following to be true:

### A.    Use of NIBIN to Identify Violent Gang Members

5.    In February 2021, I reviewed multiple leads generated through the National Integrated Ballistics Information Network ("NIBIN"). NIBIN is a nationally-networked system that allows for the capture and comparison of ballistic evidence, mainly in the form of fired cartridge casings ("FCCs"),[1] that helps solve and prevent violent crimes utilizing firearms.

6.    NIBIN leads are intended for investigative purposes only; they posit the potential association between two or more pieces of firearms ballistic evidence based on a correlation

---

[1] The basic components of a single round of ammunition include the case (aka the brass), the primer, the powder, and the projectile (aka the bullet). When the firing sequence is initiated inside the firearm, the primer is struck igniting the powder, which results in the buildup of immense pressure inside the case. The pressure subsequently forces the projectile away from the case and down the firearm's barrel in rapid succession. The completion of the firing sequence leaves the case intact with an embedded spent primer, identified in the law enforcement community as an FCC. Although FCCs are associated with a variety of firearms, in the context of NIBIN, FCCs specifically refer to those pieces of ballistic evidence that have been ejected from semi-automatic or automatic firearms.

review of the digital images in the NIBIN database by a firearms examiner or trained NIBIN technician.  From experience, I know leads often turn into NIBIN hits where the two pieces of ballistic evidence are confirmed as a match by a firearms examiner via the use of microscopic examination in a laboratory setting.  Thus, NIBIN leads are treated as high probably matches worthy of investigative follow up.

7.   I know from training and experience that FCCs are the most common pieces of ballistic evidence associated with the NIBIN database.  I have learned that FCCs are entered into the NIBIN database two different ways.  First, FCCs recovered at crime scenes are entered into the NIBIN database.  Second, test fire FCCs expended from a known firearm taken into law enforcement custody are also entered into the NIBIN database.

**B.    Investigation Initiation**

8.   In mid to late February 2021, I began to review multiple intelligence leads produced by NIBIN that linked multiple shooting incidents together spanning Los Angeles and San Bernardino Counties.  NIBIN links incidents by determining when those incidents appear to involve a common firearm used in the incident, either because law enforcement recovered the firearm or an FCC ejected from the firearm on scene.  Based on my initial review of the intelligence leads I learned of the following events:

a.   The first shooting incident occurred on or about October 5, 2020, in an assault with a firearm where

approximately 42 FCCs were recovered occurring in the City of Pasadena.

b.    The second incident occurred on or about October 19, 2020, in an attempted homicide with approximately 29 FCCs recovered in the City of Pasadena.

c.    The third incident occurred on or about November 6, 2020, in an attempted homicide with approximately 17 FCCs recovered again in the City of Pasadena.

d.    The fourth incident occurred on or about December 6, 2020, in an assault with a firearm where approximately 30 FCCs were recovered, occurring in the City of Lancaster.

e.    The fifth incident occurred on or about December 20, 2020, in an assault with a firearm in the City of Altadena.

f.    The sixth incident occurred on or about December 21, 2020, in a homicide in the City of Ontario.

g.    The seventh incident occurred on or about January 27, 2021, in a homicide with approximately 18 FCCs recovered in the City of San Bernardino.

h.    The eighth incident occurred on February 17, 2021, in an assault with a firearm with approximately 47 FCCs recovered in the City of Ontario (This shooting event is the incident on which this affidavit focuses).

i.    The ninth incident occurred on or about April 15, 2021, where Pasadena PD recovered a firearm located in the residence of a known Pasadena Denver Lane Bloods ("PDL") gang member that correlated through NIBIN as a potential homicide firearm used in the December 21, 2020, Ontario homicide.

9.    Shortly after reviewing the initial NIBIN leads in February, I reached out to Ontario Police Department ("OPD") regarding the increase in shootings and gun violence in their area.  I attended a meeting with OPD and other impacted departments where detectives identified a larger "gang war" between PDL and the allied Altadena Bloc Crips ("ABC") and Duroc Crips.

10.    Detectives also spoke about a shooting on or about December 20, 2020, in the City of Ontario at a candlelight vigil paying respects to a PDL member murdered the day before in Los Angeles, in which attendees accused Duroc Crips of shooting at the vigil.  OPD recovered approximately 49 FCCs on scene.  They also spoke about a suspected ABC/PDL related homicide the following day on December 21, 2020, on G Street in Ontario and the shooting referenced in this affidavit on February 17, 2021. At a later date, I also spoke with detectives assigned to the Riverside County Sheriff's Department in Moreno Valley who stated that they had a shooting in the Moreno Valley area also appearing to be PDL and ABC/Duroc related on February 18th the day following the Solano shooting, resulting in two females being shot.

11.    The shootings between the gangs appeared to continue with another shooting occurring at the Solano residence, same residence as the February 17 shooting, on or about May 21, 2021. Detectives also know of other suspected violent incidents between ABC, Duroc, and PDL.  As of now, all of the referenced

incidents are the subjects of open and active investigations with no charges filed to my knowledge.

**C.   The Gang Shootout on North Solano Avenue**

12.   On February 17, 2021, OPD received multiple calls reporting a shooting at 1555 North Solano Avenue in Ontario, California.  OPD responded to the home and learned, from interviewing individuals at the home, that they were holding a funeral party for a suspected ABC gang member who recently died as the result of a gunshot wound.

a.   One person at the house, D.R.,[2] said that everybody at the house had gathered following the funeral of B.B. in Colton.  D.R. said that B.B. was a 24-year-old male from Altadena, California, with unspecified gang affiliations.

b.   Another person, B.B.'s family member, said that she knew many people at the gathering were ABC members and that she was concerned about them attending for that reason.

c.   Officers also interviewed a juvenile neighbor who said that he/she saw the group of people arrive at the Solano address about 20 minutes before the shooting.  He/She said that he/she knew the group members were Crips because his/her father was a Crip and he/she recognized the indicia immediately. He/She saw that the people at the Solano address were all wearing blue, and he/she saw them throw signs that he/she recognized as Crip gang signs.

---

[2] Law enforcement knows the names of all individuals identified in this affidavit with initials, but I have abbreviated them here for their privacy.

       d.   Finally, officers encountered multiple subjects at the home, and a later review of surveillance footage showed even more subjects, who were wearing blue and/or had writing on their clothes such as "Altadena," "ABC" and "D," which, in the detectives' training and experience, indicates affiliation with the ABC or the Duroc Crips criminal street gangs.  When OPD later executed a search warrant at the home, they found a memorial booklet for B.B. hung on a wall next to a blue "ALTAD3NA" hat.[3]



    13.  Individuals at the home told officers that, during the party, approximately three unidentified subjects, believed to be affiliated with PDL, approached on foot from across the street

---

[3] I have redacted B.B.'s personal information from the booklet.

and began to shoot at various subjects at the 1555 North Solano residence.  Based on the results of the investigation into the apparent ongoing "gang war" playing out in the City of Ontario and throughout Los Angeles, Riverside, and San Bernardino Counties this incident appears to be another violent confrontation stemming from the ongoing feud between ABC/Duroc Crips and PDL.  Some of the people at the gathering spoke about ABC's feud with PDL.

      a.   B.B.'s family member said that B.B. was an ABC member.  P.N. believed that PDL targeted the funeral gathering based on ABC's years-long feud with PDL and based on an unknown PDL member posting a photo of B.B.'s memorial photo on social media with a large red X through it.  He said that most of his family at the gathering were Crip gang members and that his family has had several incidents with PDL.  He said that he firmly believed that the shooters were PDL members targeting the gathering, though he noted that his family purposely did not post about the gathering on social media to avoid any PDL conflict.

      b.   Another person present, TAYLOR, said that B.B. was an ABC member and that ABC had been "beefing" with PDL and all the other Bloods from the "Valley."

14.  While on scene, OPD detectives authored a search warrant for the residence and some of the surrounding vehicles. During the service of the warrant, police recovered five firearms, ammunition, and a surveillance DVR system for multiple cameras outside the home that captured the shooting.

15.   The footage showed that once the PDL members fired the initial shots, at least five subjects from the ABC funeral party ran from the home's backyard into the front yard and began firing recklessly toward the unidentified PDL members.  The video clearly showed that the funeral-party members who ran to the front yard with firearms left the safety of the home or the backyard after the shooting appeared to stop so they could fire retaliation shots toward the unidentified PDL members.

16.   During the incident, both sides of the shooting (aggressors and retaliators) discharged firearms recklessly, hitting houses and vehicles throughout the neighborhood.

a.   For example, officers interviewed a neighbor on Solano Avenue who said he was sitting inside his living room when he heard the gunshots.  The neighbor's wife was in their front yard watering, so he rushed outside and yelled at her to come inside.  After the shots stopped, he walked outside to his front yard and found three bullet holes in a brick wall on the side of his house.

b.   Officers interviewed a neighbor who was outside working on a vehicle in front of his home when he heard approximately 20-25 gunshots.  His young daughter ran outside to see what happened, but he told her to get back inside.  Another neighbor stated that he heard gun shots and grabbed his daughter from the couch near a window and went to the bedroom while gun shots continued.

c.   Officers interviewed another neighbor who said that he was in his living room when he heard gunshots.  After

the shooting stopped, he went out to his garage and saw a bullet hole in his garage door.  The bullet traveled through his garage door and lodged into the interior door that leads from his garage into his home.  Another bullet struck the bumper of his car parked in the driveway.  Based on my review of the surveillance footage, the position of the neighbor's home relative to the shooting indicates that the shots came from one of the shooters in the ABC funeral party.

17.  I watched the surveillance video, and the video shows approximately twenty individuals armed with handguns at the Solano residence.  This affidavit focuses on five violent felons in possession of firearms and/or ammunition whom I identified on the surveillance video.

**D.   TAYLOR**

18.  I identified TAYLOR in the surveillance footage because OPD contacted and identified TAYLOR on scene.

19.  At approximately 4:00pm in the afternoon on February 17, 2021, TAYLOR was walking in front of the residence with two females.  TAYLOR was wearing white pants, a white shirt, a white fedora hat, and a dark vest.  While walking out front, approximately three hooded individuals carrying firearms began shooting at the residence.  TAYLOR hid behind a vehicle trailer and attempted multiple times to pull a concealed firearm from either his waistband or pocket.[4]  After several attempts, TAYLOR

---

[4] The surveillance video shows TAYLOR walking in the front yard before the unidentified PDL members arrive and begin to shoot.  Therefore, TAYLOR was carrying the firearm in his pants before the first shots were fired and before any imminent danger had arisen.

successfully pulled out a handgun and, while ducking behind the
trailer, recklessly began shooting rounds throughout the
neighborhood.  The video shows TAYLOR fire multiple rounds from
the handgun.  The handgun clearly recoils and disperses smoke
from the muzzle when fired, and the force projected from the
muzzle causes debris from the trailer to shift into the air.
Additionally, multiple neighboring vehicles and houses were hit
by individuals shooting away from the residence.  The
photographs below depict TAYLOR shooting what appears to be a
revolver, and I have circled one instance of a visible recoil

and smoke dispersion from the muzzle.  Below those photos, I
have included TAYLOR's California driver's license photo.








20.  After the initial shooting stopped, TAYLOR ran back
into the residence holding his front waistband and closed the
front door.  Minutes later, after others had run outside from
the home and its backyard into the front yard, an individual
later identified as ROBERTS accidentally fired a mini-revolver-
style firearm into the ground in the home's side yard.  The
gunshot apparently frightened LYNDOLPH (discussed later herein)
on the front lawn, who then turned and shot a firearm back
toward the side yard, nearly hitting some of his ABC/Duroc
associates.  At that point, TAYLOR came back out the front door
of the home carrying a revolver, likely because he mistook
ROBERTS's and/or LYNDOLPH's shots for more PDL gunfire.  Based
on my training and experience identifying firearms and my review
of the video, TAYLOR was carrying a .38 special Charter Arms
Corp. revolver, bearing serial number 865405, that OPD later
found while executing the search warrant at the residence.  I
also believe that the revolver was the same gun TAYLOR fired

13

near the trailer; OPD did not recover any FCCs in that area, and
I know, from my training and experience, that revolvers do not
eject FCCs like other kinds of semiautomatic firearms.  I have
examined that firearm, and I determined that it was manufactured
outside the State of California.

21.  A short while later, OPD responded to the residence.
Before OPD arrived, TAYLOR went back inside, changed his
clothes, and then came back outside wearing a bright
yellow/green sweatshirt and a different pair of darker jeans.  I
believe that TAYLOR changed his clothes to avoid detection by
law enforcement to inhibit OPD's efforts to identify those
involved in the shooting.

22.  TAYLOR was identified on the scene by OPD and arrested
for being a potential shooter.  During an interview with OPD,
TAYLOR stated that he didn't have any firearms and was not
involved in the shooting that afternoon.

23.  When OPD executed a search warrant at the Solano
residence shortly after they arrived, they discovered that
TAYLOR appears to live at 1555 N. Solano Avenue with his
girlfriend.  First, the surveillance footage showed that he had
a change of clothes at the residence.  Second, officers found
items in the home that appeared to belong to TAYLOR, including
his California driver's license.  Third, he was on surveillance
video earlier in the morning wearing a different set of clothes,
possibly pajamas, setting up decorations for the party.

a.  Inside the residence, officers found three
firearms and ammunition.  One of the firearms, a 7.62 x 25mm

14

Model TT-33C bearing serial number BI1654, was found loaded in a
bathroom in the residence.   Another firearm, the Charter Arms
revolver described above, was found inside one of the bedrooms
in the top dresser drawer.  TAYLOR's California driver's license
was found in a pair of pants near the foot of the bed next to
the dresser.  I believe that this revolver is the same firearm
because the surveillance footage captured TAYLOR firing the gun
in areas where officers did not recover FCCs, and I know from my
training and experience that revolvers do not eject FCCs.
Additionally, the footage clearly shows TAYLOR carrying the
revolver exiting the residence. The revolver is also smaller and
easily concealed within his pocket.  In the same room, officers
also found a 9mm black Berretta, Model 92FS, semi-automatic
handgun bearing serial number BER089460Z, loaded with a high
capacity magazine in a black bag next to the dresser.

24.  I reviewed certified conviction documents for TAYLOR
and learned that TAYLOR has previously been convicted of a
felony crime punishable by a term of imprisonment exceeding one
year, namely, California Penal Code Section 245(b), Assault with
a Deadly Weapon Semi-Automatic Firearm, in the Superior Court
for the State of California, County of Los Angeles, case number
KA079512-01, on or about July 18, 2008.

25.  I also reviewed records from the California Department
of Corrections and Rehabilitation showing that TAYLOR is
currently on parole for that conviction until August 24, 2022.

### E.    ROACH

26.  Though he did not remain on scene when OPD arrived, Law enforcement identified ROACH based on facial recognition of his image recorded from the surveillance video and social media searches.

27.  About 20-25 seconds after the presumed PDL members shot at the residence, multiple subjects from the Solano residence came from the backyard and out of the side gate of the house.  The surveillance camera on the residence was pointed directly at the side gate capturing each subject coming out of the side gate.  The video clearly shows multiple individuals wearing gang paraphernalia holding handguns come from the backyard.  Two of the subjects are clearly holding semi-automatic handguns firing recklessly into the residential neighborhood.

28.  To identify many of the shooters at the Solano residence, OPD and I used facial recognition on the individuals in the surveillance footage.  A law enforcement facial recognition database indicated that ROACH was a likely match with one of the shooters.  I queried law enforcement databases and found that ROACH was likely affiliated with ABC. Additionally, I found ROACH on Facebook and looked at photographs from his Facebook account under the name "Danny Roach (Akili)" under the Facebook Account danny.c.roach.5.  In photographs on the account, I saw ROACH without a shirt and with "ABC" tattooed across his stomach, and the individual in those photos matches the individual in the surveillance photos below.

The Facebook account also listed ROACH's date of birth, as confirmed by his criminal-history and DMV records.  Finally, the account user was "friends" with NUNLEY, discussed below, who was present at the party.  Below is a photo from ROACH's Facebook Account.



29.   Below are photos of ROACH with the red circled FCC ejecting from his firearm along with ROACH's California driver's license photo.





30.   As clearly depicted on the surveillance video, ROACH came out of the side gate of the Solano residence wearing a blue "Altadena" baseball cap, jeans, and a tri-colored hooded sweatshirt, holding a black semi-automatic handgun.  The

18

surveillance footage shows him clearly fire the gun at least twice.  The video shows the firearm recoil each time ROACH fires, and, after each recoil, I can clearly see an FCC eject from the firearm and land in the side yard area.  The surveillance footage also captured the side yard the entire time until OPD arrived, and I saw that nobody else came and tampered with the scene before then.  In total, OPD found four FCCs in the same area where ROACH fired.  I examined the four FCCs, and all the rounds of ammunition were manufactured outside the State of California.





31.  Shortly after the shooting, the surveillance footage shows ROACH leave before OPD arrived, presumably with his firearm.

32.   I reviewed certified conviction documents for ROACH and learned that ROACH has previously been convicted of felony crimes punishable by a term of imprisonment exceeding one year, namely, California Penal Code Sections 664/187, Attempted Murder with Firearm, 211, Robbery, and PC 664/211, Attempted Robbery, in the Superior Court for the State of California, County of Los Angeles, Case Number GA03639801, on or about October 8, 1999.

**F.   NUNLEY**

33.   I also identified NUNLEY in the surveillance footage because OPD contacted and identified NUNLEY at the Solano residence.

34.   The footage showed NUNLEY wearing a large blue T-shirt and jeans.   The footage captures him multiple times on different cameras.   At one point on the side-yard camera, the surveillance video shows that NUNLEY walked back into the backyard holding what appeared to be a black Glock style pistol with an extended magazine.   Later in the footage, NUNLEY walked out of the backyard across the front lawn and out of view.   And just before OPD arrived on scene, the footage shows a dark-colored Dodge Durango pulling up to the residence and parking directly across the street.   NUNLEY then got out of the driver's side of the vehicle and walked back across the street, where OPD detained him pending further investigation.   Below are photos from the

surveillance footage with the firearm circled in red, as well as
NUNLEY's California driver's license photo.








35.   The search warrant that OPD authored included the nearby Dodge Durango NUNLEY drove.  I queried the license plate number, hidden under a paper temporary plate, and discovered the Durango was currently registered to NUNLEY.  When executing the search warrant, OPD found a Glock, Model 19, 9mm caliber pistol, bearing serial number BGUF874, loaded with a high-capacity magazine, inside the center console of the Durango.  Next to the firearm was NUNLEY's wallet containing his California driver's license.  This handgun is the same style of handgun NUNLEY carried in the surveillance footage.  Therefore, I believe it was the same firearm, and I believe NUNLEY hid the gun in his car before returning to the home as OPD arrived.  I examined the firearm and ammunition, and it was all manufactured outside the State of California.

36.   I reviewed certified conviction documents for NUNLEY and learned that NUNLEY has previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, California Penal Code Section 211, Robbery, in the Superior Court for the State of California, County of San

Bernardino, case number FSB1203930, on or about September 17, 2012.

      **G.   ROBERTS**

     37.  I identified ROBERTS on the surveillance footage because OPD discovered his wallet and California driver's license in his vehicle.  Additionally, after OPD executed a search warrant on his vehicle and towed it, ROBERTS personally came to the OPD Station to pick up his wallet and towed vehicle.

     38.  Before he fired any shots, the surveillance footage shows ROBERTS holding what appears to be, based on my training and experience identifying firearms, a foldable stainless steel mini-revolver standing in front of the side yard gate.  I believe that he was carrying this particular firearm because of its small size relative to ROBERTS's hands, because ROBERTS appears to fold the grip of the firearm on camera (something I recognized as somewhat abnormal for most firearms), and because of his mannerisms while handling the firearm, which were consistent with the unique kinds of actions one must take to operate this distinct style of firearm.  I have included a photo of that style firearm below, obtained from a firearm retailer's website, for reference.  Based on my training, experience, and research, the only company of which I'm aware that manufactures this style of firearm is North American Arms, and they manufacture it outside the State of California.



39.  Once the PDL shooting stopped, ROBERTS walked down the side yard holding the mini-revolver.  ROBERTS, standing next to multiple other individuals in the side yard, then stopped and leaned over into the planter area of the side yard holding the mini-revolver just barely above the dirt.  Mini-revolvers are very small, and it appears that ROBERTS attempted to safely decock the hammer while bent over.  This particular mini-revolver is a single action revolver requiring the user to manually cock the hammer back before the user can fire it.  In this case, it appears ROBERTS attempted to do the opposite, decock the hammer, so he could safely store the firearm in his pocket.

40.  While attempting to decock the hammer, ROBERTS mistakenly fired the gun into the planter.  While firing the mini-revolver, the recoil caused ROBERTS to lose control of the gun while it spun away from him and fell into the dirt planter bed next to the house.  ROBERTS was also startled by the firearm going off, and he pulled his hands away and leaned away from the gun shot.  Another unique feature of this particular mini-

24

revolver is that is has no trigger guard (a protective ring around the trigger), which allowed the gun to fly out of ROBERTS's hands when he mistakenly fired.  Most firearms contain a trigger guard that would significantly reduce the likelihood that the firearm would fly out of a person's hands if the person mistakenly fired it.  Additionally, this firearm has a very small and unique trigger that, when not handled carefully, can lead to accidental discharge, as evident here with ROBERTS.

41.  When ROBERTS accidentally fired the mini-revolver, everyone in the area looked around in fear.  Additionally, LYNDOLPH, as previously mentioned, also startled by the gunshot, turned around and shot his firearm towards ROBERTS in the side yard.

42.  A few seconds later, ROBERTS bent over and picked up the firearm from the planter.  Since the gun was just fired, the single action hammer was decocked and safe to be stored on his person.  ROBERTS then took the gun and appeared to fold the grip, similar to folding a knife, and put the gun in his pocket. Below are surveillance photos of ROBERTS with the mini-revolver as well as ROBERTS's California driver's license photo.



43.   Similar to TAYLOR's revolver, ROBERTS's revolver also did not produce an FCC.  Further, OPD likely did not recover the projectile from the ammunition because, based on the surveillance video, ROBERTS appeared to fire it directly into the dirt where it was likely buried.  As soon as the gun flew out of ROBERTS's hand, a plume of smoke and what appeared to be dirt dispersed from the planter directly below him.

44.   Based on my training and experience, the aforementioned facts about the firearm, the reaction of everyone on the video to ROBERTS's accidental discharge of the mini-revolver, LYNDOLPH shooting at him, and the powerful recoil of the revolver in ROBERTS hands I believe that ROBERTS possessed and fired a mini-revolver style firearm.

45.   I reviewed certified conviction documents for ROBERTS and learned that ROBERTS has previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, a violation of California Penal Code Sections 664(a)/266(a), Attempted Pimping, in the Superior Court for the State of California, County of Orange, case number 11CF0781, on or about May 9, 2012.

   **H.   LYNDOLPH**

46.   I identified LYNDOLPH in the surveillance footage because OPD contacted and identified LYNDOLPH on scene.

47.   After the PDL shooting stopped, LYNDOLPH initially exited the front door of the residence.  LYNDOLPH was wearing a white tank top, blue pants, blue shoes, and a gold "D" necklace.  In his right hand, he held a pistol.  LYNDOLPH walked outside

27

along the front lawn area holding the firearm.  At one point, LYNDOLPH pointed and aimed the firearm at a white Ford Explorer picking people up from the residence.  While LYNDOLPH was standing on the front lawn of the residence, ROBERTS accidentally shot his firearm in the side yard, causing LYNDOLPH to turn around and shoot at others at the Solano residence.  The bullet struck the wall just inches away from multiple people. Below are photos from the surveillance footage.  I have highlighted in red the impact from the bullet and the time stamps between the two images showing LYNDOLPH shooting the firearm and the expelled projectile impacting the wall.  I have also included LYNDOLPH's California driver's license photo.







48.   Based on my training and experience and my review of the video, LYNDOLPH clearly points the firearm and shoots a round.  The video shows the firearm recoil as he shot.  Additionally, the two different cameras show LYNDOLPH simultaneously fire the round as the bullet strikes the wall next to the Solano residence.

49.   Further, in my training and experience identifying firearms, I can see that the firearm is a M11 or M12 style

firearm, closed bolt, semiautomatic handgun.  I have examined
hundreds of firearms in my career, and I have undergone special
training with ATF to identify firearms and their manufacturers.
M11/M12 style firearms have a very distinct appearance, and I am
unaware of any other companies that manufactures firearms with
the same appearance.   I am not aware of any M11/M12 style
firearms being manufactured within the State of California.

50.  Shortly after the shooting, the footage shows LYNDOLPH
on the side yard hiding his firearm inside what appeared to be a
black garbage bag.  A short time later, he returned to the bag
and retrieved the firearm, possibly hiding it in another
location.

51.  Once OPD arrived, OPD body camera footage as well as
the surveillance camera footage show LYNDOLPH wearing a light-
colored hooded sweatshirt and mask.  It appears LYNDOLPH was
trying to hide his appearance by changing out of the clothes he
wore earlier.  An OPD Officer contacted LYNDOLPH on scene, and
LYNDOLPH provided his information but declined to speak
regarding the incident.

52.  I reviewed certified conviction documents for LYNDOLPH
and learned that LYNDOLPH has previously been convicted of the
following felony crimes punishable by a term of imprisonment
exceeding one year:

a.   On or about October 12, 2016, a violation of
California Penal Code Sections 69, Obstruct/Resist an Officer,
and 459, Burglary, in the Superior Court for the State of
California, County of San Bernardino, case number 16CR048420;

b.    On or about June 25, 2014, a violation of California Penal Code Sections 664/459, Attempted Burglary, in the Superior Court for the State of California, County of San Bernardino, case number FVI1402052;

c.    On or about October 8, 2010, a violation of California Penal Code Section 12031(a)(2)(C), Possession of a Loaded Firearm by a Gang Member, in the Superior Court for the State of California, County of San Bernardino, Case Number FVA1001520; and

d.    On or about December 13, 2012, a violation of California Penal Code Section 29800(a)(1), Felon in Possession of a Firearm, in the Superior Court for the State of California, County of Los Angeles, case number GA088201.

### IV. CONCLUSION

53.   For all of the reasons described above, there is probable cause to believe that TAYLOR, ROACH, NUNLEY, ROBERTS and LYNDOLPH have committed violations of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm and/or Ammunition.


Attested to by the applicant, ATF SA Paul Kirwan, in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 22nd day of July, 2021.


_____
HON. SHERI PYM
UNITED STATES MAGISTRATE JUDGE